UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DOUGLAS E. MILLER,                )
                                  )
            Plaintiff,            )        Civil Action No. 3:20-CV-310-CHB-RSE
                                  )
v.                                )
                                  )
MARK BATSON, et al.,              )        **MEMORANDUM OPINION AND**
                                  )        **ORDER**
            Defendants.           )
                                  )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on three motions. First, Defendants Mark Batson, Troy

Best, and Louisville/Jefferson County Metro Government ("Louisville Metro") filed a Motion for

Summary Judgment. [R. 99]. Defendant Arbits Wilson also filed a Motion for Summary Judgment,

[R. 101]. Plaintiff Douglas E. Miller filed a response to both motions, [R. 115], and the defendants

replied. [R. 118]; [R. 119]. As directed by the Court, Plaintiff and Defendant Wilson have also

provided supplemental briefing. [R. 125]; [R. 126]. Also before the Court is Plaintiff's Motion to

Exclude Defendants' Expert, [R. 105]. Defendants Batson, Best, and Louisville Metro filed a

response. [R. 110]. No reply has been filed, and the time to do so has expired. Accordingly, these

three motions are fully briefed and ripe for review. For the reasons set forth herein, the Court will

grant in part and deny in part the Motion for Summary Judgment filed by Defendants Batson, Best,

and Louisville Metro; grant in part and deny in part the Motion for Summary Judgment filed by

Defendant Wilson; and deny as moot, but without prejudice, Plaintiff's Motion to Exclude.

## I.      BACKGROUND

This matter stems from an April 16, 2019 traffic stop of Plaintiff's vehicle and Plaintiff's

subsequent arrest. *See* [R. 81 (Second Amended Complaint)]. At approximately 8:01 p.m. that

1

evening, Defendant Batson, a Louisville Metro Police Department ("LMPD") Traffic Unit Officer, observed Plaintiff's vehicle traveling approximately twenty-one miles over the posted speed limit on I-264. [R. 99-2, p. 1 (Uniform Traffic Citation)]; *see generally* [R. 99-4 (Dash Cam Video)]. As a result, Defendant Batson turned on his emergency lights and siren to pull over Plaintiff's vehicle. [R. 99-2, p. 1]; [R. 99-4, 00:01–35].[1] He then observed Plaintiff leaning over to the passenger side of the car, as though he were placing something underneath the passenger's seat. [R. 99-2, p. 1]. Plaintiff ultimately pulled his vehicle over. *Id.*; [R. 99-4, 00:34–36].

When he approached Plaintiff's vehicle, Defendant Batson detected the odor of alcohol and noticed Plaintiff's bloodshot and glassy eyes. [R. 99-2, p. 1]. Plaintiff stated that he was coming from a Texas Roadhouse restaurant and had one drink, and he further advised that "there was nothing in the vehicle." *Id.* Defendant Batson returned to his patrol car, with what appears to be Plaintiff's license and registration. *Id.*; [R. 99-4, 02:07–10]; [R. 99-5, 00:30–50 (Body Cam Video)]. A few minutes later, Defendant Batson backed his patrol car up (thereby creating space between the two vehicles, presumably for the purpose of conducting field sobriety tests) and approached the passenger side window of Plaintiff's car. [R. 99-4, 0:4:21–5:03]. Upon asking Plaintiff to exit the vehicle, he observed an empty beer bottle "partially tucked" under the passenger's seat. [R. 99-2, p. 1]; [R. 99-5, 03:36–43]. Defendant Batson noted in his citation that it was a "Budweiser select, warm to the touch and empty." [R. 99-2, p. 1]. While the bottle is not visible on Defendant Batson's body cam, Plaintiff admitted in his deposition that he had attempted

---

[1] When citing the dash camera ("dash cam") and body camera ("body cam") footage, the Court references the time indicated by the video player (rather than the time stamp located at the top of each video). These videos were filed conventionally in the record. [R. 110]. However, the Court refers to them by their record entry numbers. *See* [R. 99-4 (Dash Cam Video)]; [R. 99-5 (Body Cam Video)]. Additionally, while the parties submitted three segments of the body cam footage (one of the stop and arrest and two taken at the station, after the arrest), the Court cites to the segment showing the stop and arrest, unless otherwise indicated.

to put an empty beer bottle under the passenger seat "because it doesn't look good." [R. 99-3, p. 49:2–9 (Miller Dep. Excerpts)].[2]

Plaintiff exited his vehicle, and Defendant Batson then administered a series of Standardized Field Sobriety Tests ("SFSTs"). [R. 99-2, p. 1]; *see also* [R. 99-4, 5:10–10:15]; [R. 99-5, 03:59–8:45]. At the conclusion of these tests, Defendant Batson again asked Plaintiff how much he had to drink, and Plaintiff responded, "Two or three." [R. 99-5, 08:45–8:50]. Defendant Batson asked Plaintiff if he would be willing to take a Personal Breath Test ("PBT"), and Plaintiff agreed. *Id.* at 8:52–09:07; *see also* [R. 99-2, p. 1]. The pair walked to the patrol car, and after some further discussion, Defendant Batson again asked Plaintiff if he would be willing to take a PBT. [R. 99-5, 09:10–10:20]. Plaintiff asked what Defendant Batson would do if Plaintiff declined to take a PBT, and whether he would be arrested. *Id.* at 10:22–27. Defendant Batson responded, "I have no idea," but explained that, based on Plaintiff's attempts to hide the beer bottle under the passenger seat, he believed Plaintiff had committed a felony, specifically, tampering with physical evidence. *Id.* at 10:27–10:40. Plaintiff did not respond further, and after approximately two seconds, Defendant Batson asked him to turn around and put his arms behind his back. *Id.* at 10:40–43.

After a struggle, the facts of which are outlined in more detail below, Defendant Batson executed a "takedown maneuver" or "leg sweep" and took Plaintiff to the ground. *Id.* at 10:43–51; *see also* [R. 99-2, p. 1 (noting that he "conducted a leg sweep and took the offender to the ground")]. Defendant Batson radioed for assistance but continued to struggle with Plaintiff on the ground, eventually announcing that Plaintiff was under arrest. [R. 99-5, 10:51–11:04]. Shortly thereafter, Defendant Wilson arrived on the scene. *Id.* at 11:08. Defendant Wilson, a tow truck

---

[2] When citing to deposition transcripts, the Court refers to the page number assigned of the transcript itself, and not the page number assigned by the Court's electronic docketing system.

driver employed by Defendant Louisville Metro, had been driving by the scene and stopped to provide a tow, if necessary. [R. 101:4, pp. 31:11–32:1–9 (Wilson Dep. Excerpts)]. While very little of Wilson's involvement is captured on the body cam, he testified that, when he saw the two men struggling, he ran to the scene and assisted Defendant Batson in placing handcuffs on Plaintiff. [R. 126-1, p. 48:15 ("I helped handcuff Mr. Miller.") (Wilson Dep. Excerpts)]; *see also* [R. 99-5, 11:40–47]. Defendant Batson continued to hold Plaintiff on the ground. [R. 99-5, 11:54–13:14]. Defendant Best, another LMPD officer, then arrived on the scene and knelt on Plaintiff's back and neck or shoulder area.[3] *Id.* at 13:14–13:30. Plaintiff was eventually permitted to roll over onto his side and sit upright. *Id.* at 15:22–28.

Plaintiff was transported to the police station, where he completed a breath test and a blood test. *See* [R. 110-2 (Breath Test Results)]; [R. 110-3 (Blood Test Results)]. He was charged with speeding twenty-one miles over the speed limit; operating a motor vehicle under the influence of alcohol/drugs; resisting arrest; and criminal mischief. *See* [R. 110, p. 5].

On April 15, 2020, Plaintiff filed suit in Jefferson Circuit Court. [R. 1-1, pp. 3–13 (State Court Complaint)]. Defendants removed the matter to this Court on April 29, 2020. [R. 1 (Notice of Removal)]. Meanwhile, the then-ongoing COVID-19 pandemic delayed resolution of Plaintiff's state criminal charges. *See* [R. 26 (May 11, 2001 Joint Status Report)]. The Court therefore suspended the deadlines in this civil proceeding pending the resolution of those state matters. [R. 27]. Plaintiff now represents, and Defendants do not dispute, that Plaintiff eventually plead

---

[3] In his deposition, Defendant Best disputed that he put his knee on Plaintiff's head and neck, insisting instead that he put his knee on Plaintiff's shoulder area. *See* [R. 115, p. 61:8–18 (Best Dep. Excerpts)]. It is not entirely clear from the video footage that Defendant Best placed his knee *directly* on Plaintiff's neck. *See* [R. 99-5, 13:14–13:30]. But as discussed in more detail below, regardless of whether Defendant Best's knee was placed directly on Plaintiff's neck or only on his shoulder, there remains a genuine dispute of fact as to whether Plaintiff was resisting arrest and whether any such force was justified.

guilty to speeding twenty-one miles over the speed limit, and the remaining state criminal charges were dismissed in February 2023. *See* [R. 110, pp. 5–6]; [R. 115, p. 15].

Shortly thereafter, on February 15, 2023, Plaintiff filed an amended complaint in this case. [R. 50 (First Amended Complaint)]. Later, on May 29, 2024, he received leave to file his Second Amended Complaint. *See* [R. 81 (Second Amended Complaint)]. In this operative complaint, he names as defendants Batson, Best, Wilson, and Louisville Metro. *Id.* at 1. Against these defendants, he alleges five "counts," but he includes various state and federal causes of action across these five counts. *See id.* at ¶¶ 7–45. Given the lack of clarity in the pleading, it is difficult to discern from the Second Amended Complaint precisely what claims Plaintiff asserts and against which defendants. Nevertheless, the Court has thoroughly reviewed the pleadings and the parties' briefing, and from the best the Court can tell, Plaintiff asserts the following causes of action.

Against Defendants Batson, Best, and Wilson, Plaintiff brings federal claims under 42 U.S.C. § 1983 for violations of his "rights to be free from an illegal search and seizure pursuant to the Fourth and Fourteenth Amendments of the United States Constitution." *Id.* ¶ 13. In their briefing, however, the parties address three distinct § 1983 claims: one for violation of the right to be free from excessive force and unreasonable seizure (against Defendants Batson, Best, and Wilson), one for false imprisonment (against Defendants Batson, Best, and Wilson), and one for malicious prosecution (against Defendant Batson only). *See, e.g.*, [R. 99-1, pp. 8–16]; [R. 115, pp. 16–24]; [R. 118, pp. 2–4]; *but see* [R. 101-1, pp. 5–10 (addressing only a § 1983 claim for excessive force)]. This last § 1983 claim, asserted against Defendant Batson only, appears to stem from Plaintiff's "Count IV," in which Plaintiff brings a claim for malicious prosecution but fails to cite the source of law (federal statute or state common law). *See* [R. 81, ¶¶ 25–30].

Against Defendants Batson, Best, and Wilson, Plaintiff appears to also bring state law claims for "excessive execution and/or excessive force," assault and battery, and false imprisonment, all arising under Kentucky common law. [R. 81 ¶ 8]. The parties also interpret Plaintiff's Count IV as a malicious prosecution claim arising under state common law, against Defendant Batson only. *See, e.g.*, [R. 99-1, p. 20].

Against Defendants Batson, Best, and Wilson, Plaintiff also purports to bring additional state law claims relating to Kentucky's criminal statutes. More specifically, he brings claims for official misconduct arising under Kentucky Revised Statute ("KRS") § 522.030[4]; assault under KRS § 508.030; and tampering with physical evidence arising under KRS § 524.100. [R. 81, ¶¶ 9–11]. As a basis for bringing civil claims for violations of criminal statutes, he cites to KRS § 446.070, which provides in full, "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." KRS § 446.070; *see also* [R. 81, ¶ 12].

Against Defendant Louisville Metro, Plaintiff brings claims for "supervisory liability, failure to train, and final policymaker liability," labeled as Count II. *Id.* ¶¶ 15–20. The crux of these claims seems to be that Defendant Louisville Metro failed to adequately train the individual defendants on the use of force "or their training consisted of a clandestine Custom and Practice on how to beat an innocent citizen while giving impractical, impossible or untruthful commands." *Id.* ¶ 16. Then, in Count III, Plaintiff brings a claim for "municipal/organizational liability." *Id.* ¶¶ 21–24. As for this claim, Plaintiff asserts that Defendant Louisville Metro is directly responsible for Plaintiff's injuries due to its failure to train and supervise its officers, employees, and contractors, and its failure to "inculcate lawful policies, customs and practices" to prevent such misconduct.

---

[4] For his official misconduct claim, Plaintiff also cites to KRS § 533.030, but this statute relates to the conditions of probation and conditional discharge.

*Id.* ¶ 22. Plaintiff alleges that there exists "a continuing policy, pattern, custom and/or practice of Defendants of willfully and deliberately ignoring the rights of citizens." *Id.* ¶ 23. As for these claims, the Second Amended Complaint alleges that Defendant Louisville Metro has "violate[d] both state and federal law," *id.* ¶¶ 20, 24, but fails to identify any specific source of law. Nevertheless, the parties' briefing addresses these as § 1983 municipal liability claims, and the Court will therefore not address any such state law claims against Defendant Louisville Metro. [R. 99-1, pp. 21–24]; [R. 115, pp. 28–33].

Plaintiff also brings a claim against Defendant Louisville Metro for an alleged violation of the Kentucky Open Records Act, labeled as Count V. *Id.* ¶¶ 31–41.[5]

Defendants have now filed their motions for summary judgment, [R. 99]; [R. 101], which are fully briefed. [R. 115]; [R. 118]; [R. 119]; [R. 125]; [R. 126]. Plaintiff has also filed a Motion to Exclude Defendant's Expert, [R. 105], which is also fully briefed. [R. 110]. All pending motions are therefore ripe and ready for review.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it finds "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

---

[5] Plaintiff also asserts a separate claim for punitive damages, labeled as Count VI. [R. 81, ¶¶ 42–45]. However, punitive damages is not a standalone claim but is instead a remedy that may be available for another cause of action. *Petrey v. Ethicon, Inc.*, No. 5:19-298-DCR, 2019 WL 5295185, at *3 (E.D. Ky. Oct. 18, 2019) (citation omitted).

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

Once the moving party satisfies this burden, the non-moving party must then produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205 (6th Cir. 1995) (citation omitted); *see Turner-Meadows v. GM, LLC*, 786 Fed. App'x 592, 595–96 (6th Cir. 2019). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59 (1970)). Moreover, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

Importantly, in cases like this one, where body cam and dash cam videos exist, the Court views the facts "in the light depicted by the videos," but only "[t]o the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007));

*see also Feagin v. Mansfield Police Dept.*, --- F. 4ᵗʰ ---, 2025 WL 2621665, at *1–2 (6th Cir. Sep. 11, 2025). "For those moments where the footage does not aid [the Court's] understanding, [the Court] fill[s] in the blanks by considering disputed evidence in the light most favorable to [the non-moving party], completing the story with any uncontested factual assertions the [moving parties] proffer." *Feagin*, 2025 WL 2621665, at *2 (citations omitted); *see also Gordon v. Bierenga*, 20 F.4th 1077, 1079 (6th Cir. 2021) ("If the facts shown on video 'can be interpreted in multiple ways or if [the] videos do not show all relevant facts,' we view those facts in the light most favorable to the non-moving party." (quoting *Latits*, 878 F.3d at 547)).

Ultimately, if the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, then there is no genuine issue of material fact and summary judgment is appropriate. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III.    ANALYSIS

As noted above, Plaintiff alleges various causes of action, which the Court organizes into the following categories: § 1983 claims against the individual defendants; § 1983 municipal liability claims against Defendant Louisville Metro; and state law claims.  The Court will first turn to the parties' arguments with respect to Plaintiff's § 1983 claims.

### A.  Section 1983 Claims Against Defendants Batson, Best, and Wilson

Section 1983 is a civil remedy for those whose constitutional rights have been violated by individuals acting under the color of law. *See Jackson v. City of Cleveland*, 925 F.3d 793, 813 (6th Cir. 2019) (citation omitted). In seeking redress against an individual under this statute, a plaintiff must prove "(1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law." *Webb v.*

*United States*, 789 F.3d 647, 659 (6th Cir. 2015) (citing *Marcilis v. Twp. of Redford*, 693 F.3d 589, 595 (6th Cir.2012); *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001)).

However, government actors may be shielded from §1983 liability under the doctrine of qualified immunity. This doctrine provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 601–02 (6th Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). To evaluate a qualified immunity defense, the Court considers two questions:

> First, the court considers whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right. If the facts alleged fail to establish a constitutional violation, then the inquiry ends and the officer is entitled to qualified immunity. If, however, the facts alleged are sufficient to establish a constitutional violation, then the Court must determine whether the particular right allegedly violated was clearly established at the time the violation occurred.

*Id.* at 602 (internal citations omitted). In other words, qualified immunity does not apply if (1) "a constitutional violation occurred, and (2) the alleged violation was of 'clearly established constitutional rights of which a reasonable person would have known.'" *Webb v. United States*, 789 F.3d at 659 (quoting *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002)).

As already explained, the parties in the present case have interpreted Plaintiff's Second Amended Complaint as asserting the following § 1983 claims: one for violation of the right to be free from excessive force and unreasonable seizure (against Defendants Batson, Best, and Wilson), one for false imprisonment (against Defendants Batson, Best, and Wilson), and one for malicious prosecution (against Defendant Batson only). Each of these individual defendants argues that he is entitled to qualified immunity on these federal claims.

10

However, in reviewing these arguments, the Court developed concerns as to whether Defendant Wilson was a person "acting under color of law," as required to succeed on a § 1983 claim. *See Webb*, 789 F.3d at 659. The Court therefore ordered Plaintiff and Defendant Wilson to provide supplemental briefing on this and related issues. [R. 122]. Those briefs have since been filed. *See* [R. 125], [R. 126]. The Court will first address the claims against Defendant Wilson and specifically, whether he was acting under "color of law"[6] before turning to the officer-defendants' qualified immunity arguments.[7]

### 1. Defendant Wilson

As explained, a prerequisite to a § 1983 claim is that the defendant was acting "under color of any statute, ordinance, regulation, custom, or usage, of any State," 42 U.S.C. § 1983, or, in other words, "under color of law." *Webb*, 789 F.3d at 659. The Supreme Court recently explained that "this provision protects against acts attributable to a State, not those of a private person." *Lindke v. Freed*, 601 U.S. 187, 194 (2024). This is referred to as "the state-action requirement," and one acting under color of law is referred to as a "state actor." *See, e.g.*, *Mackey v. Rising*, 106 F.4th 552, 558 (6th Cir. 2024).

In his supplemental brief, Defendant Wilson admits that "a non-law enforcement officer 'may' be held liable under § 1983 under specific circumstances," but, he states, "in order for § 1983 liability to attach, the defendant must have been acting under color of law *at the time* the alleged

---

[6] To the extent Plaintiff argues that the Court should not address this issue because Wilson did not raise it in his initial motion, *see* [R. 126, p. 4–5], the Court directs the parties to Rule 56(f)(2), which permits the Court, "after giving notice and a reasonable time to respond," to "grant the [summary judgment] motion on grounds not raised by either party." Fed. R. Civ. P. 56(f)(2). Here, the parties were put on notice of this issue and given adequate time to respond, and did respond. *See* [R. 122]; [R. 125]; [R. 126].

[7] Neither Defendant Batson nor Defendant Best dispute that they were acting under the color of law. *See generally* [R. 99]. Indeed, on-duty police officers are quintessential state actors. *See, e.g.*, *Lindke*, 601 U.S. at 195 ("Courts do not ordinarily pause to consider whether § 1983 applies to the actions of police officers, public schools, or prison officials." (collecting cases)); *Webb*, 789 F.3d at 659 ("[T]he law-enforcement defendants indisputably acted under color of law.").

wrongs occurred." [R. 125, pp. 4–5 (emphasis in original) (citation omitted)]. Defendant Wilson argues that he "was on scene in his capacity as a tow truck driver for [Louisville Metro]," and "[n]owhere in his job description does he have any duty to assist with the apprehension of criminal suspects" or "arrest powers." *Id.* at 1–2; *see also* [R. 125-1 (Def. Wilson's Job Description)]. Moreover, he asserts, he does not "have any sort of agreement, tacit or otherwise, to act in concert with the police." [R. 125, p. 2]. Therefore, Defendant Wilson contends, he "was acting as a private citizen when he rendered brief assistance to [Defendant] Batson," *id.*, and as a result, Plaintiff's § 1983 claims against him must fail. *Id.* at 5.

In Plaintiff's Supplemental Brief, however, he argues that Defendant Wilson's assistance of Defendant Batson constituted state action. *See generally* [R. 126]. For support, he notes that Wilson was

> (1) a government employee, (2) present at the scene in his capacity as a government employee, (3) cloaked in the uniform and badge of his government employment, and (4) engaged in a use of force and detention of [Plaintiff], so [Defendant] Wilson claims, pursuant to the training and direction of his government employee supervisor, Allen Ryan.

*Id.* at 9. These facts, Plaintiff argues, "support the conclusion that [Defendant] Wilson was acting under color of law when he decided to use force and engage in the detention of" Plaintiff. *Id.* Plaintiff also cites to Seventh Circuit case law to argue that, "'[i]n most cases, the state actor is an officer *or employee* of the state government and *it is easy to conclude that the person's actions are fairly attributable to the state*.'" *Id.* at 5 (emphasis in original) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816 (7th Cir. 2009)).

To the extent Plaintiff argues that Defendant Wilson was a state actor by virtue of his employment alone, that argument is easily disposed of. While it is true that "'[s]tate employment is generally sufficient to render the defendant a state actor,'" this overarching statement is subject

to a number of important limitations. *West v. Atkins*, 487 U.S. 42, 50 (1988) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 n.18 (1982)). For instance, the Supreme Court has explained that "generally, a public employee acts under color of state law while *acting in his official capacity* or while *exercising his responsibilities pursuant to state law*." *Id.* (citations omitted). And more recently, the Supreme Court has clarified that a plaintiff "cannot hang his hat on [a defendant's] status as a state employee," because "[t]he distinction between private conduct and state action turns on substance, not labels." *Lindke*, 601 U.S. at 197. Thus, a private party may very well be a state actor if he acts with the authority of the state, and a state employee may be acting in his capacity as a private citizen, even if he is "on the clock." *Id.* at 196–97. Categorizing a defendant's conduct into state action or private action "can require a close look." *Id.* at 197.

In line with this precedent, the Sixth Circuit has explained that § 1983 "is generally not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved as he did without the authority of his office." *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001) (citing *West*, 487 U.S. at 49). Thus, when considering whether a challenged action qualifies as state action, courts follow a two-part test and consider (1) "whether an official 'possessed state authority' to take the action," such as through a state statute, ordinance, regulation, custom, or usage, and (2) "'whether [the official] purported to act under that authority' on the specific occasion." *Mackey*, 106 F.4th at 559 (quoting *Dean v. Byerley*, 354 F.3d 540, 553 (6th Cir. 2004)). It is clear, then, that Defendant Wilson's status as a state employee alone is not determinative. *See, e.g.*, *Lindke*, 601 U.S. at 197.

Thus, the Court turns to the two-part test[8] and begins its analysis by asking whether Defendant Wilson possessed state authority to take the action at issue here. This step "requires courts to identify the 'nature of the act' that the plaintiff challenges, and to compare that act with the state-assigned 'responsibilities' of the official who committed it." *Mackey*, 106 F.4th at 559 (citations omitted). Importantly, "[t]he state official possesses the authority to take a challenged action only if the action meaningfully relates to the official's 'governmental status' or the 'performance of his duties.'" *Id.* (citation omitted).

In certain circumstances, this question will be easily answered, such as when "a state regulation tasked the employee with engaging in the specific conduct at issue." *Id.* at 559. For example, where police department regulations vested a police officer with the duty to "stop crime '24 hours a day,'" the officer possessed the requisite state authority when he shot three bar patrons while attempting to end a middle-of-the-night bar fight, even though he was off duty at the time. *Id.* (discussing *Stengel v. Belcher*, 522 F.2d 438 (6th Cir. 1975)). On other occasions, however, the answer may not be so clear. For example, in some cases, a state official's conduct might still qualify as state action even though the particular action he took (e.g., a police officer's *excessive* use of force) was not authorized by state law or regulation (e.g., it violates the state's use-of-force regulations), or in other words, where he misused his state authority. *Id.* at 560. In those scenarios, it is important to look beyond the specific action at issue and consider instead whether the state

---

[8] Plaintiff briefly suggests the Court should employ the "symbiotic relationship or nexus test." [R. 126, pp. 8–9 (citing *Chapman v. Higbee Co.*, 319 F.3d 825, 833–35 (6th Cir. 2003))]. However, this test is typically used to determine whether a private party (e.g., a doctor), who has been hired by the state to perform public services (e.g., providing medical care to prisoners), qualifies as a state actor under § 1983. *See Mackey*, 106 F.4th at 558. And the Sixth Circuit's recent cases *Mackey* and *Lawson* make clear that this test is inapplicable when addressing whether public employees acted pursuant to state-given authority. *See id.*; *Lawson*, 137 F.4th at 412; *see also Lindke*, 601 U.S. at 198–199; *Montalvo v. Freeman*, No. 1:24-CV-1350, 2025 WL 464174, at *5 (W.D. Mich. Jan. 6, 2025), *report and recommendation adopted*, No. 1:24-CV-1350, 2025 WL 458259 (W.D. Mich. Feb. 11, 2025).

"delegated the *general* 'type of authority' that an official exercised." *Id.* (citing *Lindke*, 601 U.S. at 200).

In the present case, the parties seem to agree that the "nature of the act" at issue involves Defendant Wilson's assistance in an arrest or detention, and/or his use of force against an individual. *See generally* [R. 125]; [R. 126]. Next, the Court must compare those actions to Defendant Wilson's state-assigned responsibilities. *Mackey*, 106 F.4th at 559. On that point, Defendant Wilson's job description provides that, as a Tow-In Equipment Operator, he is responsible for towing illegally parked cars or cars at accident scenes; towing damaged or broken-down police vehicles and other city-owned equipment; changing tires and batteries; unlocking locked vehicles; releasing impounded vehicles to the owners; and other similar tasks. [R. 125-1]. His job description does not contain any specific grant of authority to arrest or detain individuals, or to use force against individuals, or to assist police officers in doing so. Indeed, in his deposition, Defendant Wilson testified that tow-truck operators "are sworn in, but [they] are not police," and confirmed that he "do[es] not have arrest powers." [R. 126-1, pp. 19:24–25, 20:4–6 (Wilson Dep. Excerpts)]. Plaintiff has not cited any statute or regulation that would provide such powers. Thus, on the record before the Court, there is no statue, ordinance, regulation, custom, or usage tasking Defendant Wilson with "engaging in the specific conduct at issue." *Mackey*, 106 F.4th at 559.

Nor does it appear that this is a case where a state employee misused the *general* type of authority given to him by the state. *Id.* at 560. Relevant to this analysis, Plaintiff argues that Defendant Wilson was a state actor because "he joined the fray . . . not as an ad hoc or coincidental happenstance of merely being physically present at the scene, but specifically in reliance on what he claimed was the instruction from his . . . supervisor." [R. 126, p. 7]. Defendant Wilson discussed this "instruction" from his supervisor in his deposition. Specifically, he testified that his supervisor,

Allen Ryan, told him, "[I]f you see somebody in distress, . . . you help them," but Ryan did not elaborate. [R. 126-1, pp. 28:7–25, 29:2–8]. The Court is not convinced that this testimony answers the state-action question.

First, Defendant Wilson's testimony on this point is less than definite. When asked the first two times whether he became involved with Plaintiff and Defendant Batson because of Ryan's direction, Wilson answered that "he stopped to help make sure they didn't fall out in traffic," and then that he "helped to keep them from falling out in traffic." *Id.* at 32:20–25, 33:1–9. Only on the third iteration of the question—in which Plaintiff's counsel asked "[a]nd [your involvement] was pursuant to the direction you received from Mr. Ryan; wouldn't you agree?" —did Defendant Wilson answer "I believe so." *Id.* at 33:10–14.

Second, nothing in Ryan's broad statement suggests that the state has imbued Defendant Wilson with the general authority to arrest or detain an individual, use force in aid of the police, or assist the police in arresting an individual. Instead, when viewed in conjunction with Defendant Wilson's job description and testimony about his work-related duties, it appears that, at most, Ryan instructed Defendant Wilson to stop and help those individuals "in distress" due to automobile-related issues, like being broken down on the side of the road, having a flat tire, or locking their keys in their car. *See* [R. 125-1 (Job Description)]; *Lawson v. Creely*, 137 F.4th 404, 414–15 (6th Cir. 2025) (finding that a public school policy that employees should "take reasonable and commonly accepted measures to protect the health, safety, and well-being of others" was not state authorization to investigate coworker and search her purse for suspected drugs, after undertaking "a holistic review of the school's policies"). Indeed, Defendant Wilson himself understood that he did not have powers to arrest anyone, nor was he told he should assist the police in doing so, by Ryan or anyone else. *See* [R. 126-1, pp. 26:11–25, 27:1–25]. Beyond citing to Ryan's broad

statement and analyzing it within a vacuum, Plaintiff does not cite to any policy or practice of Defendant Wilson's employer, Louisville Metro, that "delegated the *general* 'type of authority' that [Defendant Wilson] exercised." *Mackey*, 106 F.4th at 560 (quoting *Lindke*, 601 U.S. at 200). Based on the record before the Court, a reasonable jury could not find that Defendant Louisville Metro delegated such authority to Defendant Wilson. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].").

This analysis is not altered by Plaintiff's argument about Defendant Wilson's attire, including a "hi-vis yellow uniform" with his name and a badge with the Louisville Metro crest or seal. *See* [R. 126, pp. 6, 9]; *see also* [R. 126-1, p. 8 (Wilson Dep. 52:18–53:10) (discussing his attire)]. For support, he cites to *Chapman v. Higbee Co.*, 319 F.3d 825, 833–35 (6th Cir. 2003). But in *Chapman*, a private security guard—an off-duty sheriff's deputy—conducted a strip search of a suspected shoplifter in a department store, and the Sixth Circuit was therefore applying a state-action test (i.e., the symbiotic or nexus test) to determine whether a *private* party was acting as an arm of the state. *Id.* at 835. Here, by contrast, Defendant Wilson is a public employee, and as already explained, that test is inapplicable in determining whether *public* employees acted pursuant to state-given authority. *See supra* n.8; *see also Mackey*, 106 F.4th at 558; *Lawson*, 137 F.4th at 412; *Lindke*, 601 U.S. at 198–199; *Montalvo*, 2025 WL 464174, at *5.[9]

---

[9] The Court also notes that, were it considering whether a *private* party's assistance with an arrest qualified as state action, it would find guidance in *Kenny v. Bartman*, No. 16-2152, 2017 WL 3613601 (6th Cir. May 19, 2017). In that case, and in others, a private citizen's ad hoc assistance to a police officer was insufficient to transform the private citizen into a state actor. *See id.* at *3; *Boerste v. Ellis Towing, LLC*, 607 F. Supp. 3d 721, 735, 735 n.7 (W.D. Ky. 2022) (acknowledging that the defendants, private tow-truck drivers, had not contested that they were state actors but noting that whether "one instruction from a police officer [would] transform a tow-truck operator into a state actor" is "not obvious under Sixth Circuit and Supreme Court caselaw"); *Charles v. Johnson*, 18 F.4th 686, 691–92 (11th Cir. 2021) (finding that bystander defendant who assisted officer in restraining suspect was not a state actor because "a civilian's rendering of brief, ad hoc assistance to a law enforcement officer is not state action, absent proof of

Simply put, "conduct is not attributable to the State unless [the defendant] was 'possessed of state authority to" act in the challenged way. *Lindke*, 601 U.S. at 199. On the record before the Court a reasonable jury could not find that Defendant Wilson possessed the authority to exercise physical force or assist in an arrest when performing his job-related functions. As such, he was not acting under color of law when he assisted Defendant Batson during the arrest. The Court will therefore grant summary judgment in favor of Defendant Wilson on Plaintiff's § 1983 claims.

### 2. Defendants Batson and Best

Defendants Batson and Best argue that they are shielded by the doctrine of qualified immunity and are therefore entitled to judgment as a matter of law on Plaintiff's § 1983 claims. Government actors like Batson and Best "are protected from liability by the doctrine of qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Webb*, 789 F.3d at 659 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). But qualified immunity does not apply if (1) "a constitutional violation occurred, and (2) the alleged violation was of 'clearly established constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002)). Thus, for each of Plaintiff's § 1983 claims (excessive force, false arrest, and malicious prosecution), the Court considers whether a constitutional violation occurred and whether that right was clearly established at the time of its violation.

### a. Excessive Force

#### i. Constitutional Violation

---

conspiracy to violate the constitutional rights of another" (citation omitted)); *Proffitt v. Ridgway*, 279 F.3d 503, 508 (7th Cir. 2002) ("[W]e do not think that the rendering of brief, ad hoc assistance to a public officer transforms a bystander into a state actor, exposing him to liability under federal law and, by doing so, discouraging people from helping the police.").

As to Plaintiff's § 1983 excessive force claim, Defendants briefly argue that Plaintiff cannot bring this claim under the Fourteenth Amendment. *See* [R. 99-1, p. 8]. Plaintiff does not respond to this argument. *See* [R. 115]. Regardless, the Sixth Circuit has clarified the distinction between excessive force claims brought under the Fourth Amendment (which prohibits the excessive use of force against someone in the course of an arrest or against one who has been arrested but has not yet received a judicial determination of probable cause) and the Fourteenth Amendment (which provides the same protection for pretrial detainees who have received a judicial determination of probable cause but have not yet been found guilty). *See Colson v. City of Alcoa*, 37 F.4th 1182, 1187 (6th Cir. 2022); *Pierce v. Bailey*, No. 1:22-cv-863, 2024 WL 2138045, at *3 (W.D. Mich. Apr. 26, 2024) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). At the time of the incident in question, Plaintiff was in the course of being arrested or had just been arrested. The Court therefore understands that Plaintiff's § 1983 claims are properly analyzed under the Fourth Amendment.

As the Sixth Circuit has explained, "[t]he Fourth Amendment's guarantee against unreasonable seizures encompasses a protection against use of excessive, or unreasonable, force 'in the context of an arrest or investigatory stop.'" *King v. City of Rockford*, 97 F.4th 379, 393 (6th Cir. 2024) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Under this standard, "[t]he reasonableness of a use of force is assessed from the perspective of a reasonable officer on the scene without the benefit of '20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396–97). In other words, "courts look 'only to the facts that were knowable to the defendant officer[]' at the time." *Shumate v. City of Adrian*, 44 F.4th 427, 440 (6th Cir. 2022) (quoting *Reich v. City of Elizabethtown*, 945 F.3d 968, 979 (6th Cir. 2019)). But the Court is not required to "accept the officers' subjective view of the facts when making" its reasonableness assessment. *LaPlante*, 30

F.4th at 579 (quoting *Jacobs v. Alam*, 915 F.3d 1028, 1041 (6th Cir. 2019)) (internal quotation marks omitted).

Moreover, "in determining whether the use of force in effecting an arrest is excessive in violation of the Fourth Amendment, [courts] must determine 'whether the officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Shumate*, 44 F.4th at 440 (quoting *Graham*, 490 U.S. at 397) (cleaned up). And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgment[s]—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 396–97) (internal quotation marks omitted).

This reasonableness inquiry "entails consideration of the totality of the circumstances," but courts typically consider the following list of factors, sometimes referred to as the *Graham* factors: "(1) 'the severity of the crime at issue;' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others;' and (3) whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396); *see also Robinson v. City of Knoxville*, No. 24-5159, 2025 WL 621451, at *8 (6th Cir. Feb. 26, 2025) (citing *Graham*, 490 U.S. at 396). "These factors are not exhaustive, but merely guide courts as they consider whether the officer's use of force was objectively reasonable under the totality of the circumstances." *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1004 (6th Cir. 2024) (quoting *Palma v. Johns*, 27 F.4th 419, 428–29 (6th Cir. 2022)) (internal quotation marks omitted).

The Court also notes that Plaintiff has divided the use of force incident into three separate segments in his "counterstatement of facts," arguing briefly in a footnote that excessive force was used multiple times, so "the [C]ourt must segment the incident into its constituent parts to analyze

20

the claim." [R. 115, p. 6 n.26 (citing *Hammond v. Cty. of Oakland*, 825 F. App'x 344, 346 (6th Cir. 2020))]. Yet, in his analysis, Plaintiff does not clearly analyze each segment separately. *See id.* at 16–23. Regardless, under the facts of this case, the Court will consider Plaintiff's allegations "as one excessive-force claim because [the officers'] actions cannot be meaningfully separated into [three] distinct uses of force." *Moser*, 27 F.4th at 1151. Instead, this case involves "immediately consecutive uses of force," and "the plaintiff assert[s] that the uses of force were excessive for the same reasons," i.e., he was not actively resisting arrest. *Id.* (citing *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015)). It is therefore "unclear how separating the claims affected the parties' analys[es]." *Id.* Indeed, as already noted, Plaintiff does not clearly analyze each of the three segments he identifies. *See* [R. 115, pp. 16–23]. Moreover, this is not a case where "some of the disputes of material fact that preclude summary judgment" exists only as to one use of force. *See King*, 97 F.4th at 394 (acknowledging that consecutive uses of force can sometimes be analyzed together, but explaining that a "combined analysis was inappropriate" where "some of the disputes of material fact that preclude summary judgment on the second use of force do not exist as to the" first use of force, which was captured on video). Since the officers' "actions cannot be meaningfully separated into [three] different uses of excessive force," the Court will consider Plaintiff's allegations as one continuous excessive-force claim.[10] *Moser*, 27 F.4th at 1151. However, because "[e]ach officer can be held liable only for his own wrongdoing," the Court will "review the actions of each officer separately." *Reed v. Campbell Cnty.*, 80 F.4th 734, 748 (6th Cir. 2023).

---

[10] Indeed, even if the Court were to consider individual "segments," such as the initial takedown, the chokehold (before being handcuffed), and the neck/back restraints (used after handcuffing), its analysis would not change. Simply put, for the reasons stated below, there is a genuine dispute of material fact as to whether Plaintiff was actively resisting or passively resisting (if he was resisting at all) throughout the entirety of the arrest incident, and summary judgment is therefore inappropriate.

**(a) Defendant Batson**

The Court first applies the *Graham* factors to the actions of Defendant Batson. As to the first factor, the severity of the crime, Defendants assert, in a single sentence and without any citation to authority, that "[t]he crimes at issue, initially speeding more than 20 mph over the limit and driving under the influence, are very dangerous and pose[d] a substantial safety risk to [Plaintiff], [Defendant Batson], and the public." [R. 99-1, p. 9]. However, as Plaintiff notes, [R. 115, p. 18], the Sixth Circuit has consistently held that speeding and driving under the influence are "not particularly serious crimes and [neither] of them involve violence." *Harris v. City of Circleville*, 583 F.3d 356, 366 (6th Cir. 2009); *see also King*, 97 F.4th at 394 (finding that, even assuming probable cause emerged that the plaintiff was driving under the influence, the plaintiff's suspected traffic violations also were not "particularly serious crimes or crimes involving violence," so the first *Graham* factor weighed in favor of the plaintiff); *Shumate*, 44 F.4th at 443 n.6 (explaining that Sixth Circuit case law regarding the severity of the crime tend to focus on "the broader issue of public safety," such as whether the suspect was suspected of having committed a violent crime); *LaPlante v. City of Battle Creek*, 30 F.4th 572, 580 (6th Cir. 2022) (noting that a DUI is "moderately severe" and there was no allegation that the offense "was violent or otherwise resulted in any injuries"); *Eldridge v. City of Warren*, 533 F. App'x 529, 532 (6th Cir. 2013) ("[The plaintiff] was suspected of driving under the influence. Such a crime is undoubtedly serious, but not categorically 'severe' nor 'severe' on this particular occasion." (citations omitted)). And while "tensions [may have] escalated during the stop, 'there was minimal (if any) connotation of violence' presented by [Plaintiff's] behavior." *King*, 97 F.4th at 394 (quoting *Shumate*, 44 F.4th at 441). The Court therefore finds that the first *Graham* factor weighs against the reasonableness of Defendant Batson's use of force.

The second *Graham* factor, "whether the suspect poses an immediate threat to the safety of the officers or others," 490 U.S. at 396, also weighs against a finding of reasonableness. This factor asks whether Defendant Batson "could have reasonably considered [Plaintiff] to pose an immediate threat to officer safety at the moments before force was applied." *See Shumate*, 44 F.4th at 443. Defendants argue that Plaintiff's "actions after the stop rendered him an immediate threat to [Defendant] Batson and himself." [R. 99-1, p. 9]. They explain that Defendant Batson "did not have time to stop and analyze [Plaintiff's] intentions as he broke away from his grasp on the side of a busy interstate highway at dusk after [Plaintiff] had shown multiple clues of impairment." *Id.* Instead, they argue, Defendant Batson "had to make a split-second decision as to what he needed to do in order to gain control of [Plaintiff]," for the protection of Plaintiff and "those driving on the interstate." *Id.* at 9–10. Again, Defendants fail to cite any legal authority in support of their position, and they devote no more than five sentences to this argument. *Id.*

Plaintiff, on the other hand, argues that the body cam video demonstrates that he was "at all times calm and courteous," "gave no indication that he was a risk to the safety of himself or [Defendant] Batson," and "it was [Defendant] Batson, not [Plaintiff], who initiated and escalated the physical violence." [R. 115, pp. 18–19]. Moreover, he refutes Defendant Batson's argument about the location—the side of the highway—being dangerous because Defendant Batson "felt safe enough to have [Plaintiff] perform the SFSTs on the side of the highway, exercises which included challenges to balance, further away from the protection of either [of their] vehicles." *Id.* Because this is not a case involving "violent thrashing" or an "attempt to hit officers or by making a display of force," Plaintiff argues, this second factor weighs against a finding of reasonableness. *Id.* at 19 (citing *Kent v. Oakland Cnty.*, 810 F.3d 384, 391 (6th Cir. 2016); *Rudlaff v. Gillispie*, 791 F.3d 638, 640 (6th Cir. 2015)).

The Court has reviewed the video evidence and finds that neither party's description of events is clearly depicted in the footage. The video evidence does not plainly demonstrate that Plaintiff "broke away" several times (or at all) before the takedown, as asserted by Defendant Batson. *See* [R. 99-1, p. 9]; [99-5, 10:30–51 (Body Cam Video)]; [R. 99-4, 12:05–12:14 (Dash Cam Video)].[11] Nor does it clearly demonstrate that Defendant Batson "initiated and escalated the physical violence," as Plaintiff argues. [R. 115, p. 19]. Indeed, the video footage demonstrates that, at all times before Defendant Batson told Plaintiff to turn around and put his hands behind his back, Plaintiff had a calm and compliant demeanor and was following Defendant Batson's commands. *See, e.g.*, [R. 99-5, 00:01–10:43]. Because the video footage largely "does not aid [the Court's] understanding, [the Court] fill[s] in the blanks by considering disputed evidence in the light most favorable to [the plaintiff]." *Feagin*, 2025 WL 2621665, at *2 (citations omitted). Here, viewing the evidence of record in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff did *not* pose an immediate threat to the safety of the officers or others.

On this point, Defendants cite (in their statement of the facts) to a line in Plaintiff's interview with LMPD's Professional Standards Unit "PSU" where he states that he was "backing up" after Defendant Batson brought out the handcuffs, *see* [R. 99-1, p. 3 n.3 (citing [R. 99-7, p. 2])], for their assertion that Plaintiff "pull[ed] away from [Defendant] Batson's grasp." *Id.* at 3. Again, this "backing up" is not clearly depicted on the video footage, and the video does not clearly show that Plaintiff was breaking away, or even attempting to break away, from the officer's grasp at any point during the arrest incident. And in his PSU interview, Plaintiff goes on to explain that he had actually put his hands up in front of him so that the officer could handcuff him with his hands to the front of his body, rather than around his back. [R. 99-7, p. 2 (Plaintiff PSU Interview

---

[11] In the dash cam video, the parties are only partially in the frame while discussing the PBT test and during Defendant Batson's initial restraint of Plaintiff. The remainder of the altercation occurs out of frame, and no audio can be heard.

Excerpts)]. More specifically, he explains that he was "backing up," but "not like I'm gonna attack him," but instead so the officer could handcuff him from the front. *Id.* In his PSU interview, he also repeatedly stated that he "kept sayin'" during this time that he would take the PBT test, *id.*, and those comments *are* clearly heard in the video. [R. 99-5, 10:42–50 (Body Cam Footage)]. Moreover, it appears that Defendant Batson was firmly grasping Plaintiff's arm for the entirety of this initial interaction, further undercutting his argument that Plaintiff might dart into traffic. *Id.* at 10:40–50. Viewing this evidence in the light most favorable to the plaintiff (to the extent the video evidence does not assist the Court), a jury could conclude that a reasonable officer on the scene would not credibly have felt that Plaintiff posed an immediate threat to the safety of the officer, the plaintiff, or the public, such that a takedown was justified.

True, the Sixth Circuit has noted that the side of the road does have inherent dangers due to moving traffic. *See, e.g.*, *Williams v. Sandel*, 433 F. App'x 353, 361 (6th Cir. 2011) (noting that although the plaintiff and police officer "remained in the emergency lane next to the median," "there is some risk inherent in standing alongside traffic moving at such high speeds"); *Kelly v. Sines*, 647 F. App'x 572, 575–76 (6th Cir. 2016) (same). However, in recognizing this danger, the Court emphasized that the plaintiff "ha[d] been engaging in bizarre and highly erratic behavior," and had moved towards, and actually into, the lanes of moving traffic, *see Williams*, 433 F. App'x at 361, or the plaintiff was "standing in the middle of a lane on the interstate," and it was dark outside. *See Kelly*, 647 F. App'x at 576. The evidence in this case does not demonstrate any of these aggravating factors. In any case, as argued by Plaintiff, Defendant Batson's alleged concerns about the roadside location are belied by his willingness to have Plaintiff complete the SFSTs while standing at least as close to the roadside as at the time of the seizure and takedown. And once Plaintiff had been taken to the ground, the parties were in the grass, separated from the busy

25

interstate by Defendant Batson's patrol car and the emergency lane. *See, e.g.*, [R. 99-5, 10:50–58]. Moreover, in evaluating this second *Graham* factor, Defendant Batson primarily focuses on the potential safety threats arising prior to the takedown, and not after Plaintiff was on the ground. *See* [R. 99-1, pp. 9–10 (arguing only that Plaintiff posed a threat before the takedown)]; [R. 119, pp. 2–3 (same)]. Accordingly, the second *Graham* factor weighs against finding Defendant Batson's actions were reasonable.

Finally, the third *Graham* factor calls on the Court to evaluate whether Plaintiff was "actively resisting arrest or attempting to evade arrest by flight." *See Graham*, 490 U.S. at 396. In the Sixth Circuit,

> [a]ctive resistance "can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders." *Jackson v. Washtenaw Cnty.*, 678 F. App'x 302, 306 (6th Cir. 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015)); *Rudlaff*, 791 F.3d at 641. Mere passive resistance, in contrast, entails a "lack of physical resistance or verbal antagonism." *Jackson*, 678 F. App'x at 306; [*Eldridge*, 533 F. App'x at 535]. This circuit has elaborated that "a failure to present one's arms to an officer upon request without more" constitutes passive resistance at most, but "a physical struggle to maintain control of one's limbs while being placed in handcuffs can be active resistance." *Jackson*, 678 F. App'x at 307; *cf. Shumate*, 44 F.4th at 448–49 (determining that a reasonable juror could find plaintiff merely passively resisting when he pulled his arms back to avoid officer's handcuffs and later failed to provide his hands from beneath his body on the ground).

*King*, 97 F.4th at 395–96. Along these lines, the Sixth Circuit has held that "takedown maneuvers are excessive when officers deal with a 'generally compliant' suspect, and that the police may not use physical force against a subdued, non-resisting subject." *LaPlante*, 30 F.4th at 583 (citations omitted).

As to this third factor, Defendant Batson argues that Plaintiff's "actions establish that he was actively resisting arrest" by "fail[ing] to give-up his hands to allow [Defendant] Batson to effect the arrest," and "[breaking] away from [Defendant] Batson's grasp on multiple occasions prior to [the] decision to employ a takedown maneuver." [R. 99-1, p. 10]. He further argues that,

after he took Plaintiff to the ground, Plaintiff's "active resistance continued, as he failed to comply with [Defendant] Batson's order to 'get on your stomach now!' by repeatedly attempting to bridge himself up off the ground." *Id.* In response, Plaintiff asserts he "was neither an aggressor or resister" and "was helpless to [Defendant] Batson's violent onslaught of slamming him on to the hood of the cruiser and taking him down to the ground where he immediately started choking him." [R. 115, p. 20].[12] In essence, then, the parties disagree as to whether Plaintiff was actively resisting arrest, thereby warranting some use of force. Despite the parties' assertions to the contrary, the video evidence in this case does not clearly resolve the dispute.

As the Court previously stated, the body cam footage does not clearly demonstrate that Plaintiff initially broke free from Defendant Batson's grasp, nor does it demonstrate that Plaintiff refused to give up his hands to Defendant Batson. Indeed, it appears that Defendant Batson was already taking hold of Plaintiff's arm when he instructed him to place his hands behind his back. *See* [R. 99-5, 10:40–42]. Immediately after this instruction, the video depicts Plaintiff's arm moving and Defendant Batson holding it, but it is unclear whether Plaintiff was attempting to shrug Defendant Batson off or otherwise pulling away, or whether the officer was pulling Plaintiff's arm. *See id.* at 10:42–45. A reasonable interpretation of the video would also be that Plaintiff turned to tell Defendant Batson, again, that he would take the breath test. Moreover, the time between Defendant Batson's order to Plaintiff to turn around and put his hands behind his back and the full takedown maneuver onto the grass was a mere *ten* seconds. *Id.* at 10:40–50. Defendant Batson had grabbed Plaintiff within a second or two of giving the order, and pushed Plaintiff down against the

---

[12] Plaintiff also cites to findings from the Department of Justice's Investigation of the Louisville Metro Police Department and Louisville Metro Government, *see* [R. 115, pp. 21–22], which was released on March 8, 2023. *See Investigation of the Louisville Metro Police Department and Louisville Metro Government*, U.S. Dep't of Just. (Mar. 8, 2023) (hereinafter "DOJ Report"); *see also* [R. 115-15 (DOJ Report)]. The Court has concerns as to whether it can consider this now-retracted report. *See infra* Section III(B). However, for purposes of the § 1983 excessive force analysis, the Court finds that, even without considering the report, there is at least a question of disputed fact that would prevent summary judgment on this claim.

hood of the patrol car. *Id.* at 10:40–48. It is difficult to find Plaintiff resisted arrest when he was not given time to comply. *See LaPante*, 30 F.4th at 579 (explaining that, "because the orders [to show his hands, put down his beer, and put his hand behind his back] were given in rapid succession over the course of only thirty seconds, it was not clear whether [the plaintiff] understood or was given sufficient time or opportunity to comply with some of the orders before he was thrown to the ground").

Then, once Defendant Batson and Plaintiff reached the ground, it appears that Plaintiff landed on his frontside and turned immediately onto his back. *See id.* at 10:50–52. Defendant Batson had his right hand on Plaintiff's neck and radioed for assistance, saying he had "one fighting." *Id.* 10:52–59. Before using his radio, Defendant Batson told Plaintiff to roll over onto his stomach, but Defendant Batson had his hand on Plaintiff's neck at the time. *Id.* at 10:54. In his PSU statement, Defendant Batson stated his hand was "on the top of [Plaintiff's] sternum," his "fingers were close to [Plaintiff's] neck," and it was a "natural reflex" to have "both hands [ ] sort of clenched." [R. 99-8 (Def. Batson PSU Interview Excerpts)]. He also stated "there was no intention to [ ] choke or strangle." *Id.* Plaintiff, however, states Defendant Batson was "choking" him and "us[ing] a prohibited chokehold," [R. 115, p. 9], and states that the body camera footage demonstrates Defendant "Batson's thumb and forefinger squeezing [Plaintiff's] trachea." *Id.* The video demonstrates Defendant Batson's hand with his thumb out, towards the middle-front of Plaintiff's throat and his other fingers clenched on Plaintiff's throat, under Plaintiff's jaw. [R. 99-5, 10:55]. The video also demonstrates that, while Defendant Batson had his hand on Plaintiff's throat, Plaintiff was lying on his back, unmoving and quiet. *Id.* at 10:53–11:00.

After using his radio, Defendant Batson removed his hand from Plaintiff's neck and again instructed Plaintiff to roll over onto his stomach, which Plaintiff did. *See id.* at 10:59–11:04.

Defendant Batson then told Plaintiff he was under arrest, *id.* at 11:05, and Defendant Wilson

arrived. *Id.* at 11:07. A few seconds later, Defendant Batson can be seen with his arm bent around

Plaintiff's neck, with Plaintiff's chin near Defendant Batson's elbow. *Id.* at 11:11. Plaintiff then

pushed up using his left hand, and Defendant Batson told him to put it behind his back. *Id.* at 11:17.

Next, Plaintiff said, "I'm not struggling," and Defendant Batson again instructed him to put his

hand behind his back while grabbing Plaintiff by the hair and pushing his head towards the ground.

*Id.* at 11:18–22. The camera shows Defendant Batson holding Plaintiff's wrist, which Plaintiff

pointed out, and then his hand is moved behind his back. *Id.* at 11:22–37. Plaintiff was then cuffed

by Defendants Batson and Wilson, and Defendant Batson had his forearm across the back of

Plaintiff's neck. *Id.* at 11:37–43.

Approximately thirty seconds after being placed in handcuffs, Plaintiff said "you've

bloodied my nose." *Id.* at 12:19; *see also* [R. 99-11 (EMS Report)]; [R. 115-6, pp. 1–12 (photos

of Plaintiff's face after the incident)]. Defendant Batson then told Plaintiff, who was not moving

(as visible in the body camera footage), to "stay there," and Plaintiff said, "I'm not going

anywhere," and Defendant Batson replied that he needed to "quit leaning up." [R. 99-5, 12:20–

22]. In the preceding seconds, Plaintiff can be seen on the video moving his head (the only visible

part of him). *See id.* at 12:18. Throughout this exchange and for the next minute or so, Defendant

Batson was holding Plaintiff down with his forearm across the back of Plaintiff's neck or upper

back. *See id.* 12:01–36.

When Plaintiff reiterated that he was "not going anywhere," Defendant Batson replied, "I

know," to which Plaintiff said, "You don't have to sit on me." *Id.* at 12:46–48. Defendant Batson

said that he did because Plaintiff "ha[d]n't been compliant the whole time." *Id.* at 12:48–50.

Defendant Best confirmed in his PSU interview that, when he arrived about thirty seconds later,

Defendant Batson "was on top of the suspect." [R. 99-10, 168–69 (Best PSU Interview)]. Plaintiff then said "please, you're hurting me," and Defendant Batson just said to "stay there"—the only part of Plaintiff that is visible is his head, which is still. [R. 99-5, 12:57–58]. Again, Plaintiff said, "please, you're really hurting me, . . . please stop, stop." *Id.* at 13:06–14.

Importantly, at no point during the video is it clearly shown that Plaintiff's actions could be "characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders," such that his behavior would constitute "active resistance" rather than mere "passive resistance." *King*, 97 F.4th at 395–96 (citing *Jackson*, 678 F. App'x at 306). In similar cases, where an officer insisted (as Defendant Batson does) that the arrestee was struggling and physically resisting arrest, but the video evidence failed to support that contention, nor did it "blatantly contradict" the plaintiff's version of events, the Sixth Circuit found a genuine dispute of material fact. *Laury v. Rodriguez*, 659 F. App'x 837, 847 (6th Cir. 2016) (finding a genuine issue of material fact when "[a]lthough [the officer] contend[ed] [the plaintiff] was struggling, the video [did] not support that contention, nor [was] [the plaintiff's] account blatantly contradicted by the video"). Here, too, the video evidence does not clearly support Defendant Batson's allegations of active resistance, nor does it blatantly contradict Plaintiff's assertion that he was not resisting (or, at most, was passively resisting); *see also King*, 97 F.4th at 398 (explaining that, where the video footage did not resolve the dispute, and the officer's liability "turn[ed] on which version of the facts one believes," the district court properly denied summary judgment). Accordingly, a genuine dispute of material fact exists, and on the record before the Court, a reasonable jury could find that Defendant Batson's use of force (including the takedown, the chokehold, and the neck/back restraint) was unreasonable.

The Court makes one final point. The inquiry in such cases "is not whether *any* force was justified, but 'whether the [officer] could reasonably use the *degree* of force' that was employed." *LaPlante*, 30 F.4th at 579 (quoting *Roell v. Hamilton Cnty.*, 870 F.3d at 483 (6th Cir. 2017)) (cleaned up). On the record before the Court, it is not clear that Plaintiff was resisting arrest to any degree, either passively or actively, or whether he was generally compliant, and it is therefore unclear whether *any* force was justified, or precisely what level of force would have been justified under the circumstances. It is also worth noting that a reasonable jury could review the evidence of record and conclude that Defendant Batson employed some form of a chokehold against Plaintiff. The Sixth Circuit has found that a chokehold constitutes *deadly* force. *See Coley v. Lucas Cnty.*, 799 F.3d 530, 541 (6th Cir. 2015) (noting that the right to be free from "deadly physical force such as a chokehold" was clearly established). The LMPD even prohibits the use of "[c]hoking techniques," "except in a situation where the use of deadly force would be allowed." [R. 115-8, p. 4 (LMPD Standard Operating Procedure, Use of Force Section)]. To employ deadly force, the officer must have "probable cause to believe that the suspect poses a threat of *severe physical harm*." *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 424 (6th Cir. 2017) (emphasis added) (quoting *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015)) (internal quotation marks omitted); *see also* [R. 115-8, p. 11 (authorizing deadly force when the officer reasonable believes "that the person against whom the force is used poses an immediate threat of death or serious injury to the officer or another person"). Based on the record before the Court, a reasonable jury could conclude that Defendant Batson employed a choke hold against Plaintiff and that such force was unreasonable, given the lack of evidence (or even argument) that Plaintiff posed a threat of serious physical harm.

Accordingly, viewing the disputed facts (which are not clearly resolved by the video evidence) in the light most favorable to Plaintiff, a reasonable jury could find that "a reasonable officer faced with the same circumstances could not have determined [Plaintiff's] actions bore the hallmarks of active resistance." *Shumate*, 44 F.4th at 448. The third *Graham* factor therefore weighs against Defendant Batson, as do the first and second factors. Considering these factors and the totality of the circumstances, the Court finds that a reasonable jury could find that Defendant Batson violated Plaintiff's constitutional right to be free from excessive force.

### (b) Defendant Best

The Court next turns to the use of force by Defendant Best. When Defendant Best arrived, he came to the scene near Plaintiff's head and immediately knelt on Plaintiff's neck or shoulder. [R. 99-5, 13:14–16]. Defendant Best then called out "quit moving, stop resisting." *Id.* at 13:16–17. Plaintiff's head and shoulders, which were the only things visible on camera at the time, were not moving. *See id.* Plaintiff responded, "I'm not resisting, you're killing me." *Id.* at 13:17–19. Then, Defendant Batson told Defendant Best that Plaintiff was "already cuffed," and Defendant Best moved his knees from Plaintiff's back before placing one knee on the back of Plaintiff's neck or shoulder, and ultimately removing both knees and placing his hand between Plaintiff's shoulder blades. *See id.* 13:20–26. Defendant Best later placed his knee on Plaintiff's upper back for about forty-five seconds. *See id.* 13:37–14:10.

Plaintiff again requested to be released, saying "please let me up, you're hurting me," and that he was "not going anywhere," and asked, "why are you doing this to me?" *Id.* at 14:13–36. One of the officers told Plaintiff to "quit moving," *id.* at 14:39–41, but, to the extent Plaintiff is visible on video, he was not moving outside of picking his face off of the ground. *See id.* at 14:13–41. To the extent Plaintiff's body is not visible on the video, it is unclear whether he was moving.

Plaintiff then remained still and face down on the ground while Defendant Best is seen holding his arm, and another officer arrived on the scene. *See id.* at 14:41–15:01. Plaintiff then slowly rolled up onto his side, *id.* at 15:01, he was again told to "quit moving," *id.* at 15:01–04, Defendant Best replaced his knee across the back of Plaintiff's neck, and Plaintiff said he was in pain. *Id.* at 15:04–07. Plaintiff was then allowed to roll over onto his side and sit up. *Id.* at 15:24–29. These events involving Defendant Best lasted just under five minutes. *See generally id.* at 10:50–15:29.

In their motion, the defendants spend no more than five sentences addressing Defendant Best's actions. [R. 99-1, pp. 10–11]. They argue that it was reasonable for Defendant Best to believe that Plaintiff was assaulting Defendant Batson based on Defendant Batson's call for assistance over the radio, and it was reasonable for Defendant Best "to have perceived an immediate threat to [Defendant] Batson's physical safety as he believed [Plaintiff] to be actively resisting." *Id.* Plaintiff's response regarding Defendant Best largely overlaps his arguments regarding Defendant Batson. *See* [R. 115, pp. 18–22].

Turning to the first *Graham* factor, the defendants appear to argue that the crime at issue was assault on a police officer. But having reviewed the video evidence in this case, the Court finds a genuine dispute of fact as to whether a reasonable officer arriving on the scene would believe that Plaintiff, who was handcuffed on the ground and pinned beneath Defendant Batson's body, was actively assaulting Defendant Batson. As already explained, the video evidence does not clearly demonstrate that Plaintiff was resisting Defendant Batson while on the ground at the time that Defendant Best arrived on the scene. At the time Defendant Best arrived, Defendant Batson was on top of the then-handcuffed plaintiff, holding him on the ground, and Plaintiff was screaming, "Please stop!" [R. 99-5, 13:13–17]. For the same reasons, the Court finds that a reasonable jury could likewise find that Plaintiff posed no immediate threat to the safety of

Defendant Batson, himself, or others. And as the Court has explained, during this portion of Plaintiff's arrest, the parties were in the grassy area beside the emergency lane, separated from the interstate by the emergency lane and Defendant Batson's patrol car. Thus, viewing the disputed evidence in the light most favorable to the plaintiff, these first two *Graham* factors weigh against Defendant Best.

As for the third *Graham* factor, much of the Court's analysis as to Defendant Batson can be repeated here. Simply put, it is not clear from the video evidence whether Plaintiff was actively resisting, passively resisting, or being generally compliant at the time Defendant Best arrived on the scene and assisted in physically restraining Plaintiff. As already explained, while Defendant Best was initially called to the scene after Defendant Batson radioed for assistance, once he arrived on the scene, Plaintiff was handcuffed on the ground and pinned beneath Defendant Batson's body. This third factor therefore also weighs against a finding of reasonableness with respect to Defendant Best, as do the first and second factors. Considering these factors and the totality of the circumstances, the Court finds that a reasonable jury could find that Defendant Best violated Plaintiff's constitutional right to be free from excessive force.

## ii.    Clearly Established Right

The Court next turns to the second prong of its qualified immunity analysis and considers whether the constitutional right at issue in this case was clearly established at the time of their alleged violations. This analysis applies to both Defendant Batson and Defendant Best.

On this issue, the Court is mindful that it should not "define clearly established law at a high level of generality." *Moser v. Etowah Police Dep't*, 27 F.4th 1148, 1154 (6th Cir. 2022) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). However, "this does not mean that a 'a case directly on point' is required." *Dallas-Clark v. Eilert*,

No. 4:23-cv-36-RGJ-HBB, 2025 WL 466446, at *5 (W.D. Ky. Feb. 11, 2025) (quoting *Baynes v. Cleland*, 799 F.3d 600, 613 (6th Cir. 2015). Indeed,

> [j]ust as a court can generalize too much, it can generalize too little. If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas).

*Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508–09 (6th Cir. 2012). Ultimately, a right is clearly established so long as "existing precedent [has] placed the statutory or constitutional question beyond debate," *al-Kidd*, 563 U.S. at 741 (citations omitted), such that a reasonable officer had "fair warning that the conduct at issue was unconstitutional." *Baynes*, 799 F.3d at 613.

As for Plaintiff's § 1983 excessive force claim, "our precedents clearly establish that a suspect has a 'constitutional right to be free from the use of physical force by police officers when he is not resisting efforts to apprehend him.'" *Moser*, 27 F.4th at 1154 (quoting *Coffey v. Carroll*, 933 F.3d 577, 589 (6th Cir. 2019)); *see also Dallas-Clark*, 2025 WL 466446, at *5. And "[d]rawing the line at a suspect's active resistance defines the right at a level of particularity appropriate for a claim pursued under § 1983." *Moser*, 27 F.4th at 1154 (quoting *Coffey*, 933 F.3d at 589) (internal quotation marks omitted); *see also Reed*, 80 F.4th at 750–51; *Dallas-Clark*, 2025 WL 466446, at *5. Thus, in the present case, Plaintiff had "a clearly established right to be free from injury-threatening physical force when [he] was not actively resisting" an officer's attempt to arrest him. *Moser*, 27 F.4th at 1154. That right was clearly established at the time of Plaintiff's arrest in 2019. *See, e.g.*, *id.* at 1153 (finding this right to have been clearly established at the time of the incident at issue in that case, which occurred in 2017).

The Court is not persuaded otherwise by the defendants' citation to *King v. City of Rockford*, 97 F.4th 379 (6th Cir. 2024). *See* [R. 99-1, p. 12]. In that case, the plaintiff's conduct

"[ran] close to the line distinguishing passive resistance from active." *King*, 97 F.4th at 397. For example, he pulled and stepped away from the officer, attempting to free his arm from the officer's grasp and to turn his body away from the officer as he tried to grab him. *Id.* These actions were clearly depicted on the officer's dash cam. *Id.* Under those specific circumstances, the Sixth Circuit was unable to "say that 'every reasonable official would have understood' that [the plaintiff's] behavior did not rise to active resistance and thus that the [officer's] takedown [of the plaintiff] violated the Fourth Amendment." *Id.* In reaching this conclusion, the Court found that "[t]here is no clearly established principle that prevents officers from taking individuals to the ground during an investigatory detention who have acted aggressively, failed to follow an officer's commands, and whose actions suggest they were trying to flee." *Id.* (quoting *Parsons v. City of Ann Arbor*, No. 22-1338, 2023 WL 3413898, at *3 (6th Cir. May 12, 2023)). However, it acknowledged that "officers may not use a takedown against a generally compliant suspect," *id.* (citation omitted), and cases where similar levels of force are found to be unconstitutional "tend not to entail physical resistance." *Id.* (citation omitted).

This case is easily distinguishable from *King*, in which video footage clearly demonstrated that the suspect was disobeying commands and whose actions (i.e., pulling his arm away from the officer and stepping away from the officer) suggested that he was trying to flee. Instead, as already explained, the video footage in this case is less than clear and, in light of the other conflicting evidence, presents a question of fact as to whether Plaintiff was actively resisting. Indeed, the video footage does not indicate that Plaintiff was actively pulling or stepping away from the officers (or otherwise attempting to flee), acting aggressively, or even disobeying commands, as already explained. Thus, the Court finds Defendants' reliance on *King* to be misplaced.

In sum, the Court finds that Plaintiff had a "clearly established right to be free from injury-threatening physical force when [he] was not actively resisting" an officer's attempt to arrest him, and that right was clearly established at the time of his arrest in 2019. *Moser*, 27 F.4th at 1153–54. Because there exists a genuine dispute of material fact as to whether that clearly established right was violated, the Court will deny summary judgment as to the § 1983 excessive force claims against Defendants Batson and Best. *See King*, 97 F.4th at 398 (explaining that, where the video footage did not resolve the dispute, and the officer's liability "turn[ed] on which version of the facts one believes," the district court properly denied summary judgment).

### b.  False Imprisonment and Malicious Prosecution

Plaintiff's remaining § 1983 claims are for false imprisonment and malicious prosecution.[13] *See* [R. 81, ¶¶ 7–14, 25–30]. Before evaluating these claims, however, the Court first notes that the parties treat Plaintiff's § 1983 malicious prosecution claim as being asserted against Defendant Batson only. As for the false imprisonment claim, Plaintiff asserts this claim against both Defendants Batson and Best. But Defendant Best argues, and Plaintiff does not dispute, that he "neither arrested nor charged [Plaintiff] with any criminal offense." [R. 99-1, p. 16].  Defendant Best also argues that he "had probable cause to believe that [Plaintiff] had assaulted [Defendant] Batson, [so] there can be no false imprisonment claim against him." *Id.* (internal quotation marks omitted).  Nevertheless, Plaintiff wholly fails to address these arguments in his response, addressing only the information known to Defendant *Batson* at the time of the arrest. *See* [R. 115, pp. 23–24]. Therefore, the Court finds that Plaintiff has waived any opposition and thus abandoned

---

[13] Although a false imprisonment claim may arise from an arrest or an unlawful detention absent an arrest, *see, e.g.*, *Crawford v. Geiger*, 996 F. Supp. 2d 603, 619 (N.D. Ohio 2014) (citation modified), the parties have only discussed the basis for the false imprisonment claim as Plaintiff's *arrest* and the Second Amended Complaint does not otherwise specify. *See* [R. 99-1, pp. 13–16]; [R. 115, pp. 23–24]; [R. 81, ¶¶ 7–14]. Accordingly, the Court will only evaluate Plaintiff's false imprisonment claim based on his arrest. To the extent any other seizure occurred, Plaintiff has waived any Fourth Amendment arguments to that effect. *See Brown*, 545 F. App'x at 372.

this claim against Best. *See Brown*, 545 F. App'x at 372 ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). Accordingly, the Court will grant summary judgment in favor of Defendant Best on Plaintiff's § 1983 false imprisonment claim.

The Court now turns to Plaintiff's § 1983 false imprisonment and malicious prosecution claims, which are now against only Defendant Batson. As noted previously, Defendant Batson argues that he is entitled to qualified immunity on these claims, and the Court must therefore consider (1) whether a constitutional right was violated and (2) whether that right was clearly established at the time of its violation. *See, e.g.*, *Webb*, 789 F.3d at 659.

The Sixth Circuit "has recognized that claims for false arrest and malicious prosecution are both constitutionally cognizable and both arise under the Fourth Amendment." *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020) (citing *Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020)). A § 1983 false arrest claim "requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Id.* (quoting *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)). Similarly, one of the elements of a § 1983 malicious prosecution claim "is that a plaintiff must show 'that the officers helped start a prosecution against him without probable cause." *Id.* (quoting *Howse*, 953 F.3d at 408); *see also Stacy v. Clarksville Police Dept.*, 771 F. Supp.3d 1024, 1037–38 (M.D. Tenn. 2025) (reciting the elements of a malicious prosecution claim: "(1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor." (quoting *Monson v. City of Detroit*, Nos. 22-

38

2050/2122, 2024 WL 84093, at *6 (6th Cir. Jan. 8, 2024))). In the present case, the only element of either claim that the parties dispute is whether there existed probable cause for Plaintiff's arrest and prosecution. *See generally* [R. 99-1, pp. 13–16]; [R. 115, pp. 23–24]; [R. 118, pp. 6–8]. As such, Plaintiff's false arrest and malicious prosecution claims are somewhat intertwined. Stated another way, both of these claims "hinge on an alleged unreasonable seizure" and "both rise and fall on whether there was probable cause supporting the detention." *Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020).

Before turning to the parties' arguments, however, a brief discussion of recent developments in the law of false imprisonment (i.e., false arrest) claims and malicious prosecution claims is warranted. It has long been clear that, to sustain a claim for false imprisonment, a plaintiff had to show there was no probable cause for an arrest on *any* charge. *See Thomsen v. Sullivan Cnty.*, No. 2:22-cv-5, 2023 WL 4633479, at *3 (E.D. Tenn. July 19, 2023) (collecting cases). Put another way, as long probable cause existed for at least one of the charges on which he was arrested, a plaintiff's false imprisonment claim fails. *See id.* However, prior to 2020, the Sixth Circuit had not, in a published opinion, determined whether the same rule applied to claims of malicious prosecution. *See Howse*, 953 F.3d at 415 (Cole, J, dissenting) ("We have never indicated that a malicious prosecution claim fails so long as there is probable cause to prosecute on one of several charges. In every prior case where there were some valid charges on the indictment and we were tasked to consider a malicious prosecution claim on acquitted charges, we separately analyzed whether probable cause supported the charge that was the subject of the claim."). In 2020, however, the Sixth Circuit held that an officer would prevail against a claim of malicious prosecution so long as there was probable cause for at least one charge. *Id.* at 409.

In June 2024, prior to the filing of the pending motions, the Supreme Court called the Sixth Circuit's approach into question. *See Chiaverini v. City of Napoleon*, 602 U.S. 556, 562–64 (2024); *Rasawehr v. Grey*, No. 24-3322, 2025 WL 1639164, at *4 (6th Cir. June 10, 2025) (discussing *Chiaverini*); *Harrod v. Lee*, No. 24-5228, 2024 WL 5103834, at *5 (6th Cir. Dec. 13, 2024) (same); *Clemans v. Scarborough*, 3:24-CV-p334-JHM, 2024 WL 5248102, at *5 (W.D. Ky. Dec. 30, 2024) (discussing *Harrod*).  In *Chiaverini*, the Supreme Court explained that, "[c]onsistent with both the Fourth Amendment and traditional common-law practice, courts should evaluate suits [for malicious prosecution] charge by charge." *Chiaverini*, 602 U.S. at 562. The Supreme Court did not, however, address false imprisonment claims, *see generally id.*, and the Sixth Circuit has declined to address whether *Chiaverini* applies to false imprisonment claims. *See Harrod*, 2024 WL 5103834, at *6 n.3. Thus, under the current state of the law, the Court will evaluate Plaintiff's § 1983 false imprisonment claim by considering whether there was probable cause for *any* charge.

Whether the Court should do the same for the § 1983 malicious prosecution charge presents a somewhat more challenging question. Notably, none of the parties touch on this issue, despite *Chiaverini* having been issued several months before the pending motions were filed. As such, the Court considers any arguments regarding this issue to be waived. Nevertheless, the Court will endeavor to answer this question, i.e., whether it must consider probable cause as to each charge relating to the malicious prosecution claim. As explained below, that question requires the Court to jump to the second prong of the qualified immunity analysis, i.e., whether the right at issue was clearly established at the time of the alleged violation. *See generally Pearson*, 555 U.S. at 226 (explaining that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

The Sixth Circuit considered a similar issue in *Harrod v. Lee*, which was issued after the Supreme Court's decision in *Chiaverini*. In *Harrod*, the plaintiff brought a § 1983 suit stemming from an incident in 2020 that ultimately lead to his arrest for resisting arrest and aggravated assault. *Harrod*, 2024 WL 5103834, at *1–2. In affirming the district court's grant of summary judgment, the Sixth Circuit found that the arresting officer had probable cause to arrest the plaintiff for resisting arrest. *Id.* at *5. The Court then turned to the second charge, aggravated assault. *Id.* The plaintiff argued that, under *Chiaverini*, the arresting officer had to have probable cause for *both* charges; however, the Sixth Circuit declined to decide that issue. *Id.* In noted instead that, even if the arresting officer was required to have probable cause for both charges, those rights "were established by the *Chiaverini* decision in 2024, not as of his 2020 arrest." *Id.* Because the plaintiff could not overcome the "clearly established" prong of the officer's qualified immunity defense, the district court had properly granted summary judgment on that claim. *Id.*; *see also Howell v. McCormick*, 148 F.4th 834, 854 (6th Cir. 2025) (ruling similarly); *Rasawehr*, 2025 WL 1639164, at *4–5 ("Because *Chiaverini* was decided after the district court granted summary judgment, it had no effect on the 'existing precedent' at the time the individual defendants acted [in or around 2016]. Under then-existing precedent, the individual officers did not violate clearly established law because at least one of the charges was supported by probable cause."); *Clemans v. Scarborough*, No. 3:24-CV-p334-JHM, 2024 WL 5248102, at *5 (W.D. Ky. Dec. 30, 2024) (ruling similarly); *Rivera-Guadalupe*, 124 F.4th 295, 303 (3d Cir. 2024) (ruling similarly).

In the present case, Plaintiff was arrested and charged in 2019, well before *Chiaverini* was decided. Under then-existing precedent, Defendant Batson would not have violated clearly established law so long as one of the charges against Plaintiff was supported by probable cause.

Accordingly, as to both the false imprisonment and malicious prosecution claims, the Court will consider whether there was probable cause for *any* charge.

### i.    False Imprisonment

Turning first to the false imprisonment (i.e., false arrest) claim, the Court considers whether there was probable cause for any charge, *at the time of the arrest*. As explained by the Sixth Circuit,

> [a] warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence, even a minor crime. To determine whether there is probable cause for an arrest, [a court must] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. Probable cause is not a high bar, as it requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.

*United States v. Watson*, 142 F.4th 872, 878–79 (6th Cir. 2025) (internal quotation marks and citations omitted). Of course, the probable cause inquiry focuses on the information understood by Defendant Batson at the time of the arrest, not subsequently learned information. *See Harris v. City of Saginaw*, 62 F.4th 1028, 1033 (6th Cir. 2023) ("In retroactively considering whether probable cause existed, we look only to the information possessed by the arresting officer at the time of the arrest." (internal citation and quotation marks omitted)). Therefore, the Court acknowledges that Defendant Batson did not have the results of Plaintiff's breathalyzer, taken later at the booking facility, at the time of the arrest. *See* [R. 99-2, p. 2].

However, the following undisputed facts *were* known to Defendant Batson at the time of the arrest: Plaintiff was speeding in excess of twenty miles per hour over the speed limit; Plaintiff accelerated after passing Defendant Batson's cruiser; there was an empty beer bottle under Plaintiff's passenger seat that was "warm to the touch"; and Plaintiff had admitted to having two or three drinks before driving, after having initially stated he only had one. *See supra* Section I. Defendant Batson moreover stated, under oath, that there was an "odor of alcohol," [R. 115-3,

63:17–18 (Batson Dep. Excerpts)], and the EMS report corroborates this and states that Plaintiff was "noted to smell of alcohol." [R. 99-11]. In the Uniform Citation Report, Defendant Batson also recorded that Plaintiff had "bloodshot glassy eyes." [R. 99-2, p. 1].

Defendant Batson also performed several field sobriety tests, on which, according to the Uniform Citation Report, Plaintiff "showed multiple signs of impairment on all test[s]." *See id.* The Court has reviewed these videos and finds that Plaintiff committed some minor mistakes. If those minor mistakes were the only evidence supporting a probable cause determination, then the Court might be inclined to find that probable cause did not exist. *See Kinlin v. Kline*, 749 F.3d 573, 580 (6th Cir. 2014) (noting Sixth Circuit case law suggests that "failing three field sobriety tests, standing alone, was insufficient to support a finding that probable cause existed as a matter of law to arrest a driver for drunk driving" (citing *Green v. Throckmorton*, 681 F.3d 853, 866–67 (6th Cir. 2012))). But even without considering these field sobriety tests, the Court would find that probable cause exists, based on the facts cited above. *Id.* (finding probable cause to arrest for DUI where the plaintiff had "(1) made a lane change with only two feet of clearance, (2) smelled of alcohol, (3) admitted to consuming alcohol, and (4) thrice refused a field sobriety test"). Viewed from the standpoint of an objectively reasonable officer, these facts show "a probability or substantial chance of criminal activity," namely, driving under the influence. *See Watson*, 142 F.4th at 878–79 (reciting standard for probable cause). Because there was probable cause for at least one of the arresting offenses, Plaintiff's § 1983 false imprisonment (i.e., false arrest) claim fails.[14]

## ii.    Malicious Prosecution

---

[14] The Court also notes that, even if *Chiaverini* applies to false imprisonment claims, and as a result, probable cause is *now* required for each arresting offense, Plaintiff would still not be able to overcome the "clearly established" prong of the qualified immunity analysis, as that right would be clearly established by *Chiaverini* in 2024, and not as of his 2019 arrest. *See Harrod*, 2024 WL 5103834, at *5; *Howell*, 148 F.4th at 854; *Rasawehr*, 2025 WL 1639164, at *4–5

In order to distinguish the § 1983 false arrest claim from the § 1983 malicious prosecution claim, the Court "must consider not only whether [Defendant Batson] had probable cause to arrest [Plaintiff] but also whether probable cause existed to initiate the criminal proceeding against [Plaintiff]." *Sykes v. Anderson*, 625 F.3d 294, 310–11 (6th Cir. 2010) (citations omitted). But as already explained, Defendant Batson had probable cause to arrest Plaintiff for DUI, so "barring the discovery of exculpatory evidence or information undermining the initial probable cause determination sometime between when [he] was arrested and when he was charged, there also would have been probable cause to prosecute him for those crimes." *Lang v. City of Kalamazoo*, 744 F. App'x 282, 290 (6th Cir. 2018). Indeed, when arguing that they are entitled to summary judgment on the malicious prosecution claim, the defendants merely reiterate that there was probable cause for the arrest. [R. 99-1, p. 16].

Plaintiff, on the other hand, argues that the results of his breathalyzer at the booking facility demonstrated that his blood alcohol content ("BAC") was below the legal limit and, as such, there was no probable cause to charge him with a DUI. *See* [R. 115, p. 24 (citing R. 115-14, p. 1) (stating that breath test results were ".064")]. He appears to be basing his argument on KRS § 189A.010(1)(a) which states that, "[a] person shall not operate or be in physical control of a motor vehicle . . . (a) [h]aving a blood alcohol concentration of 0.08 or more . . . within two (2) hours of cessation of operation or physical control of a motor vehicle." KRS § 189A.010(1)(a). However, at the time of his arrest, subsection (1)(b) proscribed operating a vehicle "[w]hile under the influence of alcohol," and subsection (3)(b) provided that

> (3) [i]n any prosecution for a violation of subsection (1)(b) . . . the alcohol concentration in the defendant's blood as determined at the time of making analysis of his blood or breath shall give rise to the following presumption[] . . .

>> (b) If there was an alcohol concentration of 0.05 or greater but less than 0.08 based upon the definition of alcohol concentration in KRS 189A.005, that

> fact shall not constitute a presumption that the defendant either was or was not under the influence of alcohol, but that fact may be considered, together with other competent evidence, in determining the guilt or innocence of the defendant.

KRS § 189A.010(3)(b) (amended 2020).[15] In other words, the fact that Plaintiff's breathalyzer showed a blood alcohol concentration less than 0.08 (but greater than 0.05) does not conclusively demonstrate that he was not under the influence of alcohol. Instead, it is only one fact to consider. *See* KRS § 189A.010(3) ("The provisions of this subsection shall not be construed as limiting the introduction of any other competent evidence bearing upon the questions of whether the defendant was under the influence of alcohol or other substances, in any prosecution for a violation of subsection (1)(b) . . . of this section."). As already noted, there were several other facts available to Defendant Batson that gave rise to probable cause that Plaintiff was operating his motor vehicle under the influence of alcohol. *See supra* Section III(A)(2)(b)(i).

To support his § 1983 claim of malicious prosecution, at least to the extent it relates to his DUI, Plaintiff relies only on the breathalyzer test results to argue that probable cause did not exist. *See* [R. 115, p. 24]. Because the Court has concluded that those test results do not "undermin[e] the initial probable cause determination" at the time of the arrest, "there also would have been probable cause to prosecute him for" DUI. As such, Plaintiff's § 1983 malicious prosecution claim fails. *Lang v*, 744 F. App'x at 290. This is true despite the recent changes in the law under *Chiaverini* because, for the reasons already explained, even if Defendant Batson was required to have probable cause for all charges, those rights "were established by the *Chiaverini* decision in 2024, not as of [Plaintiff's 2019] arrest." *Harrod*, 2024 WL 5103834, at *5. As a result, Plaintiff cannot overcome the "clearly established" prong of Defendant Batson's qualified immunity

---

[15] The current version of § 189A.010(3)(b) replaces the first clause to read: "[i]f there was an alcohol concentration of *0.04* or greater . . . ." KRS § 189A.010(3)(b) (emphasis added).

defense, and summary judgment is appropriate. *Id.*; *see also Howell*, 148 F.4th at 854; *Rasawehr*, 2025 WL 1639164, at *4–5.

To summarize its rulings on Plaintiff's § 1983 claims thus far, the Court will (1) grant summary judgment in favor of Defendant Wilson on all § 1983 claims; (2) deny summary judgment as to both Defendants Batson and Best as to the § 1983 excessive force claim; (3) grant summary judgment in favor of Defendant Best on the § 1983 false imprisonment claim, as Plaintiff has abandoned that claim against that defendant; and (4) grant summary judgment in favor of Defendant Batson on the § 1983 false imprisonment and malicious prosecution claims. Thus, at this time, the only remaining § 1983 claim against the individual defendants is the excessive force claim against Both Defendants Batson and Best.

### B. Section 1983 Claims Against Defendant Louisville Metro

Plaintiff also asserts municipal liability claims under § 1983 against Louisville Metro. *See* [R. 81]. Specifically, Plaintiff asserts claims for "supervisory liability, failure to train, and final policymaker liability," [R. 81, ¶¶ 15–20], and for "municipal/organizational liability theories." *Id.* ¶¶ 21–25. Such claims are often called "*Monell* claims," because it was in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), that the Supreme Court first explained that

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 695. Stated another way, to hold a municipality liable under § 1983, the plaintiff must ultimately prove "that the *municipalities* themselves, as opposed to any municipal employee, were responsible for the" constitutional violation at issue. *Nichols v. Wayne Cnty., Michigan*, 822 F. App'x 445, 449 (6th Cir. 2020) (citations omitted). Ultimately, the plaintiff must show "(1) that

46

they suffered a constitutional violation and (2) that a municipal policy or custom directly caused the violation." *Hardrick v. City of Detroit*, 876 F.3d 238, 243 (6th Cir. 2017) (citing *Monell*, 436 U.S. at 690–92).

In the present case, Louisville Metro argues that Plaintiff's "*Monell* claim[s] fail[] both prongs as he cannot establish any constitutional violations or that Metro is responsible for the violations alleged to have occurred." [R. 99-1, p. 23]. However, the Court has already determined that there exist genuine disputes of material fact regarding whether a constitutional violation for excessive force occurred. Nevertheless, Louisville Metro goes on to argue that "even if a constitutional violation occurred, the record does not support allegations that [Louisville] Metro failed to adequately train or supervise its officers," or that it "had an unconstitutional pattern, practice or custom of violating the law." *Id.* However, a threshold issue requiring further briefing prevents the Court from reaching the merits of the municipal liability claims.

Plaintiff's response brief relies primarily on findings from the Department of Justice's Investigation of the Louisville Metro Police Department and Louisville Metro Government, *see* [R. 115, pp. 28–33], which was released on March 8, 2023. *See Investigation of the Louisville Metro Police Department and Louisville Metro Government*, U.S. Dep't of Just. (Mar. 8, 2023); *see also* [R. 115-15 (DOJ Report)]. On May 21, 2025, after the briefing concluding on Defendants' motions, the DOJ announced that it planned to retract this investigative report. *See* Press Release, U.S. Dep't of Just., *The U.S. Department of Justice's Civil Rights Division Dismisses Biden-Era Police Investigations and Proposed Police Consent Decrees in Louisville and Minneapolis*, (May 21, 2025), https://www.justice.gov/opa/pr/us-department-justices-civil-rights-division-dismisses-biden-era-police-investigations-and.

Given the uncertainty about the DOJ Report's viability, the Court desires further briefing from the parties as to whether it may consider the DOJ Report when evaluating Plaintiff's claims against Louisville Metro. If the parties renew their motions for summary judgment as discussed below, they should specifically address the impact of the report's retraction on the claims against Louisville Metro Government. In doing so, the parties may find it helpful to review recent cases that involved the recently retracted DOJ Report, such as *Kiner v. City of Memphis*, No. 2:23-CV-02805-SHL-TMP, 2025 WL 1577830 (W.D. Tenn. June 3, 2025).

### C. State Law Claims

Plaintiff attempts to assert a variety of state law claims against the individual defendants. As already noted, however, the Second Amended Complaint is less than clear as to precisely which state law claims Plaintiff brings, and the parties' briefing adds little clarification. From the best the Court can tell, Plaintiff asserts several claims against the individual defendants, citing Kentucky common law ("excessive execution and/or excessive force," assault and battery, false imprisonment, and malicious prosecution). [R. 81 ¶¶ 8, 25–30]. Against the individual defendants, he also brings additional state law claims under KRS § 446.070 for violations of Kentucky's criminal statutes, specifically for official misconduct, assault, and tampering with physical evidence. [R. 81, ¶¶ 9–11]. Lastly, against Defendant Louisville Metro, he brings a claim for violation of the Kentucky Open Records Act. *Id.* ¶¶ 31–41.

As to each of the state law claims asserted against them, Defendants Batson, Best, and Wilson argue that they are entitled to qualified immunity, and even absent such immunity, these claims fail as a matter of law. [R. 99-1, pp. 16–21]; [R. 101-1, pp. 10–13]. Defendant Louisville Metro also challenges the Kentucky Open Records Act claim asserted against it, arguing that

Plaintiff failed to identify any records that it failed to produce and that there is no evidence any such violation was willful. [R. 99-1, p. 25].

The Court has reviewed these arguments, but finds them to be largely undeveloped and without adequate citation to relevant legal authority or evidence of record. Indeed, for most of the state law claims, the parties devote only a few sentences in their briefs, and the Court is left guessing as to what authority or evidence of record supports those arguments. The Court is even left guessing as to which state law claims Plaintiff still pursues, and against which specific defendants he asserts these claims. And the Court has identified several issues relating to the state law claims that go untouched by the parties, despite being central to their arguments. The Court will address these issues by separate order.

The Court can, and does, address one of the state law claims, excessive execution, as discussed below. However, given the lack of developed argument on the remaining state law claims, the Court will deny the motions to the extent they seek summary judgment on those claims. However, the Court will deny the motions without prejudice as to the defendants' ability to file subsequent motions for summary judgment addressing those state law claims and specifically addressing the issues outlined in the Court's subsequent order.

As for the claim for "excessive execution and/or excessive force," the defendants argue that "'excessive execution is not a valid tort claim recognized by Kentucky law'" so the claim should be dismissed. [R. 99-1, p. 18 (quoting *Simms v. City of Harrodsburg*, NO. CIV.A. 06CV104-JMH, 2007 WL 2792174, at *6 (E.D. Ky. Sept. 21, 2007))]; [R. 101-1, p. 12 (same)]. Plaintiff does not address this in his response brief and, thus, the Court deems the claim abandoned and any opposition to the defendants' motions on this ground waived. *See Brown*, 545 F. App'x at 372 ("[The Sixth Circuit's] jurisprudence on abandonment of claims is clear: a plaintiff is deemed

to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." (collecting cases)). In any case, Defendants are correct—Kentucky does not recognize a claim of excessive execution. *See Moran v. Ky. State Police*, No. 1:23-CV-00051-GNS, 2024 WL 102217, at *5 (W.D. Ky. Jan. 9, 2024) (citing *Simms*, 2007 WL 2792174, at *6); *Phillips v. McCollum*, No. 4:11-CV-00066-JHM, 2012 WL 435766, at *14 (W.D. Ky. Feb. 9, 2012); *Wilkerson v. City of Frankfort*, No. 3 :08-12-DCR, 2009 WL 1033828, at *10 (E.D. Ky. Apr. 16, 2009). The Court will therefore grant summary judgment in favor of the defendants to the extent Plaintiff brings a claim for excessive execution.

As for the remaining claims, the Court will, by separate order, identify the various issues that the parties have failed to address in their briefing. Should the parties renew their motions for summary judgment, they must address these issues.

### D.  Motion to Exclude

Plaintiff has moved to exclude Defendants' proposed expert witness Mike Ward, [R. 105], a forensic toxicologist who has opined that Plaintiff's blood alcohol level was above the legal limit at the time of the traffic stop. *See* [R. 83-1, pp. 1, 4 (Ward Report)]. He argues that this evidence has no bearing on the issues of probable cause outlined above, as probable cause must be determined based on the facts known to the officer at the time of the action in question. *See* [R. 105, p. 2, 4–6]. Thus, Plaintiff argues, the evidence is irrelevant and should be excluded. *Id.* Defendants have filed a response in opposition. [R. 110]. No reply was filed.

Mr. Ward opines in his report that Plaintiff's blood alcohol level would have been 0.094 g/ml at the time of his arrest, and that an individual with this level of blood alcohol would display adverse effects with respect to the ability to safely operate a motor vehicle (such as incoordination, poor judgment, and slowed reaction times). [R. 83-1, p. 4]; *see also* [R. 110, p. 6]. Defendants

argue that these opinions "merely explain the evidence that was available to [Defendant] Batson on the date of Plaintiff's arrest on April 16, 2019." [R. 110, p. 7]. Yet, much of Defendants' response to the Motion to Exclude focuses on the facts known to Defendant Batson at the time of Plaintiff's arrest, which Defendants argue are sufficient to demonstrate probable cause, even without considering Mr. Ward's report. [R. 110, pp. 7–9].

The Court agrees, at least with respect to the federal claims. As it has already explained, even without consideration of Mr. Ward's report and despite the fact that Defendant Batson did not have breath or blood test results at the time of Plaintiff's arrest, the facts that *were* available to Defendant Batson gave rise to probable cause to arrest and charge Plaintiff for DUI, and the § 1983 claims for false arrest and malicious prosecution therefore fail. *See supra* Sections III(A)(2)(b)(i), (ii). As such, the Court will deny the Motion to Exclude as moot, to the extent Plaintiff seeks to exclude Mr. Ward's report from the Court's consideration of the federal claims. Because the Court declines to address the state law claims at this time, it will deny the Motion to Exclude without prejudice, to the extent Plaintiff seeks to exclude the report from the Court's consideration of those state law claims.

## IV.    CONCLUSION

For the reasons set forth above, the Court will grant summary judgment on the following claims: all § 1983 claims asserted against Defendant Wilson; the § 1983 claims for false imprisonment and malicious prosecution asserted against the individual defendants; and the state law claim for "excessive execution." The following claims remain: the § 1983 claims for excessive force against Defendants Batson and Best; the § 1983 municipal liability claims against Defendant Louisville Metro; all state law claims other than the excessive execution claim.

The Court will also deny as moot the Motion to Exclude, in part, and will otherwise deny it without prejudice. Lastly, the Court will allow the defendants to file subsequent motions for summary judgment on the *Monell* and state law claims.

Accordingly, **IT IS HEREBY ORDERED** as follows:

1. The Motion for Summary Judgment filed by Defendants Batson, Best, and Louisville Metro, [**R. 99**], is **GRANTED IN PART** and **DENIED IN PART**.

   a. The motion is **GRANTED** as to the § 1983 claims for false imprisonment and malicious prosecution, and the state law claim for "excessive execution."

   b. The motion is **DENIED** as to the § 1983 claim for excessive force.

   c. The motion is **DENIED without prejudice** as to the § 1983 municipal liability claims against Defendant Louisville Metro and the remaining state law claims.

2. The Motion for Summary Judgment filed by Defendant Wilson, [**R. 101**], is **GRANTED IN PART** and **DENIED IN PART**.

   a. The motion is **GRANTED** as to Plaintiff's § 1983 claims against Wilson, and the state law claim for "excessive execution."

   b. The motion is **DENIED without prejudice** as to the remaining state law claims.

3. The Motion to Exclude filed by Plaintiff, [**R. 105**], is **DENIED as moot** to the extent it seeks to exclude the report from the Court's consideration of the federal claims and is **DENIED without prejudice** to the extent it seeks to exclude the report from the Court's consideration of the state law claims.

4. On or before **October 31, 2025**, the parties **SHALL** meet and confer regarding the remaining claims and the issues outlined herein and file a Joint Status Report advising

as to whether any party requests that the matter be referred to a Magistrate Judge for further settlement conferences, or whether the parties agree to engage in private mediation. If the parties do not request that the matter be referred for a settlement conference or advise that they are engaging in private mediation, they shall advise the Court as to whether they intend to file any renewed motions for summary judgment or motion to exclude. The Court will thereafter set a briefing schedule. Lastly, if the parties do not request that the matter be referred for settlement conference, they do not wish to engage in private mediation, and they do not wish to file any renewed motions, they shall provide three potential trial dates between April 1, 2026 and June 26, 2026, and an estimated length of trial.

This the 30th day of September, 2025.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY